1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SHEA HOMES LIMITED PARTNERSHIP        No. C 04-0092 TEH

          Plaintiff,

     v.                               **ORDER GRANTING MOTION TO
                                      DISMISS CLAIMS FOUR THROUGH
UNITED STATES OF AMERICA,             TEN**

          Defendant.
_____/

          This matter came before the Court on July 11, 2005, on Defendant's Motion to

Dismiss the fourth through tenth claims in this action under Fed. R. Civ. P. 12(b)(1), or

alternatively, Fed. R. Civ. P. 56(c).  Defendant contends that this Court is barred, under

Section 113(h) of CERCLA, from exercising jurisdiction over Plaintiff's fourth through

tenth claims because they improperly seek to challenge the government's ongoing clean up

of a contaminated site. Defendant also contends that this Court lacks jurisdiction over

Plaintiff's fifth through tenth claims on the ground that they are barred by the discretionary

function and misrepresentation exceptions to the FTCA.  Having carefully considered the

parties' extensive written and oral arguments, supplemental filings, and the entire record

herein, the Court grants Defendant's motion for the reasons set forth below.

I.  <u>BACKGROUND</u>

**United States District Court**
For the Northern District of California

1    On September 2, 1999, Plaintiff, Shea Homes Limited Partnership ("Shea")

2    purchased a 10 acre parcel of property in Novato, California, which was previously part of

3    the  Hamilton Air Force Base ("HAFB") prior to its closure in 1974.  On December 30,

4    1999, Shea acquired an adjoining 18 acre parcel.  The combined 28 acre property adjoins a

5    part of the former HAFB which used to be the primary repository for garbage generated at

6    the HAFB (including solid and hazardous wastes) from the early 1940s until 1974.   This

7    area is now referred to as Landfill 26 ("LF 26").  It is roughly 47 acres in size, and consists

8    of a 200 foot buffer zone surrounding a 30 acre landfill "cap" that covers the area where

9    the garbage was formerly deposited.  Shea, a large residential housing developer,

10   developed the 28 acres it purchased in 1999, and has transferred ownership of some or all

11   of the property to third-parties.  It contends, however, that Defendant, the United States,

12   failed to meet its obligations to address the contamination at LF 26, causing Shea to suffer

13   damages.

14   Since 1986, the United States Army Corps of Engineers ("Corps") has been in

15   engaged in various efforts to investigate, remediate, and monitor the waste in LF 26

16   pursuant to the Defense Environmental Restoration Program –Formerly Used Defense

17   Sites ("DERP-FUDS") and orders issued by the Regional Water Quality Control Board

18   ("RWQCB").  The basic remedy chosen was the installation of the cap, referenced above,

19   which was installed in 1994-95 and covers the landfill, a ground water treatment system,

20   and a gas perimeter monitoring network.

21   In June 1996, methane in excess of 5.7% by volume was detected at one of the LF

22   26 perimeter gas monitoring probes ("GMP") - GMP No. 5.   Further sampling in early

23   and mid 1999 did not detect methane in excess of 5% by volume.  In September 1999,

24   however, after Shea's purchase of the first 10 acre parcel, methane was again detected in

25   excess of 5 % by volume at GMP 5 (17.3%) and GMP 9 (9.8%).  Subsequent monitoring

26   in October 1999 and December 1999 did not detect methane in excess of 5%.

27   In October 1999, the RWQCB did not approve final closure of the site and ordered

28   further landfill gas sampling.  In June 2000, the Corps began a supplemental testing

**United States District Court**
For the Northern District of California

program.  By the Fall of 2000, the Corps determined that methane might be migrating off-site from LF 26 in excess of 5% by volume and that further action was required.  On February 7, 2001, the RWQCB directed the Corps  to submit a plan to, *inter alia*,  reduce methane to below compliance levels.  In March 2001, the Corps proposed and evaluated seven approaches for controlling methane migration. In April 2001, the RWQCB raised various concerns with respect to the proposed remedial options, and directed the Corps to implement (1) an interim stopgap measure to immediately intercept gas migrating from LF 26 and towards the Hamilton Meadows development, (2) a long-term management plan of methane at its source, and (3) a time-schedule for implementing the gas collection and treatment activities.

In December 2001, the RWQCB issued Cleanup and Abatement Order ("CAO") 01-139 requiring the Corps to investigate, design, and implement a final remedy with respect to the methane or  face civil penalties.  Between January 2002 and January 2003, the Corps installed a 1600 foot Vent Trench with an impermeable liner in the buffer zone area between the landfill cap and Shea's property in order to intercept any landfill gas prior to migrating off-site. The Corps is currently evaluating the effectiveness of the Trench.  The Corps is also working under a RWQCB-imposed deadline of September 30, 2006 for the installation and operation of a "Landfill Corrective Action  [gas control system]." *See* Def.'s Ex. 31 at 10.

Shea does "not challenge[] the remedy selected by Defendant to abate the contamination." Pl.'s Opp. at 2.  It complains, however, that the Corp has failed to properly and timely implement its remedy and to satisfactorily abate the contamination, causing it to suffer damages. *Id*. at 1-2.  The instant action seeks monetary damages and injunctive relief.  Specifically, the complaint asserts claims for (1) cost recovery and contribution under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq., (2) for injunctive relief under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 et seq., and (3) tort damages

1   based on claims of public and private nuisance, trespass, negligence, negligence per se and

2   equitable indemnity.

3       Defendants subsequently filed the instant motion under Fed. R. Civ. P. 12(b)(1)  to

4   dismiss the RCRA and tort-based claims on the ground that the claims are barred by (1)

5   exceptions to the Federal Tort Claims Act, and/or (2) section 113(h) of CERCLA.[1]  The

6   Court addresses these arguments in turn.

7

8   II. <u>FEDERAL TORT CLAIMS ACT</u>

9       Defendant contends that this Court lacks jurisdiction over Plaintiff's state law tort

10   claims because they fall within the discretionary function exception to the Federal Tort

11   Claims Act ("FTCA"), which provides for a limited waiver of sovereign immunity from

12   claims for damages against the United States.  *United States v. Gaubert*, 499 U.S. 315

13   (1991).   It is the government's burden to demonstrate that this exception applies. *Prescott*

14   *v. U.S.*, 973 F.2d 696, 703 (9th Cir. 1992).

15       The discretionary function exception to the FTCA "is a statutory reservation of

16   sovereign immunity for a particular class of tort claims." *Gager v. United States*, 149

17   F.3d 918, 920 (1998).  It provides that liability under the FTCA shall not extend to a claim:

18       based upon the exercise or performance or the failure to exercise or perform
        a discretionary function or duty on the part of a federal agency or an
19       employee of the Government, whether or not the discretion involved is
        abused.

20

21   28 U.S.C. § 2680(a).  The basic purpose of the exception is to protect the government from

22   "judicial 'second guessing' of legislative and administrative decisions grounded in social,

23   economic, and political policy through the medium of an action in tort." *United States v.*

24   *Varig Airlines*, 467 U.S. 797, 814 (1984). It "marks the boundary between Congress'

25   willingness to impose tort liability upon the United States and its desire to protect certain

26   ⎯⎯⎯⎯⎯⎯⎯⎯⎯

27       [1] While Defendant alternatively moves for summary judgment under Fed. R. Civ.
     56(c), the Court notes that the issue of subject matter jurisdiction may properly be
     decided under Fed. R. Civ. P. 12(b)(1).  *McCarthy v. United States*, 850 F.2d 558, 560
28   (9th Cir. 1988).  In addressing this issue, the Court is not limited to the face of the
     pleadings but may consider evidence outside the complaint and resolve factual issues
     that go to the issue of the court's subject matter jurisdiction. *Id*.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1   governmental activities from exposure to suit by private individuals." *Aragon v. United*

2   *States*, 146 F.3d 819, 822 (10th Cir. 1998).

3       In *Berkovitz v. United States*, 486 U.S. 531 (1988), the Supreme Court established a

4   two-tier analysis for identifying which governmental functions are discretionary for

5   purposes of the exception.   First, a court must examine whether the challenged conduct

6   involves an element of judgment or choice, since "conduct cannot be discretionary unless it

7   involves an element of judgment or choice." *Berkovitz,* 486 U.S. at 536.  Conversely,  the

8   exception does not apply if the statute, regulation, or policy at issue prescribes a specific

9   course of action. *Aragon v. United States*, 146 F.3d  819, 823-24 (10th Cir. 1983).  In such

10  a case,  the employee has "no rightful option but to adhere to the directive." *Id*.

11      If the Court finds that the challenged conduct was "discretionary," then the court must

12  analyze whether the discretion exercised was of the type that the exception was designed to

13  shield -- i.e., choices that are grounded in social, economic, and political policy. *Gaubert*,

14  499 U.S. 315.  The exception extends from broad policy decisions made at the highest

15  levels to "low-level employees making discretionary day-to-day management decisions

16  based on policy considerations." *Childers v. U.S.*, 40 F.3d 973, 974 n.1 (9th Cir. 1995).

17  Whether the government in fact abused its discretion or was negligent is not relevant to

18  determining the applicability of the exception. *Id*. at 974; *Aragon*, 146 F.3d at 822.

19

20              1.  *Whether the challenged conduct was discretionary*

21      As noted above, the government can not satisfy the first prong of the discretionary

22  function test if there is a " federal statute, regulation, or policy in place that specifically

23  prescribed a *particular course of action*." *Miller v. U.S.*, 163 F.3d 591, 594 (1998)

24  (emphasis added); *Aragon*, 146 F.3d at 823-24 (finding that government regulations

25  "prescribed a specific, mandatory course of conduct regarding the disposal of waste water

26  from aircraft washdown operations at the Base"); *see also Berkovitz,* 486 U.S. at 536.  If a

27  particular course of action is prescribed then the government employee has no choice but to

28  follow it and the discretionary function exception does not apply.

United States District Court

For the Northern District of California

1    In this case, the regulations at issue fail to prescribe a *specific course of action* that the

2    Corps failed to follow.  Shea points to sections 20921(a) and 20937(a)(1) of Title 27 of the

3    California Code of Regulations, which the Corps is required to comply with by way of

4    federal regulations and policies.  Section 20921(a), however, only sets a numeric standard –

5    that is, it provides that methane gas migrating from the landfill "must not exceed 5% by

6    volume in air at the facility property boundary. . . "[2]   A bare, numeric standard, however, is

7    not a specific course of conduct.

8    In contrast, section 20937(a)(1) does prescribe a "course of action" in the event that the

9    5% standard is violated.  The prescribed course of action, however, is not *specific*.  Rather,

10   this section states, in relevant part, that:

11       When the results of gas monitoring indicate concentrations of methane in
         excess of the compliance levels required by § 20921(a), the operator shall:
12
         (1) Take all immediate steps necessary to protect public health and safety, and
13       the environment .

14   Cal. Code Regs., tit. 27 § 20937(a)(1).  On its face, this language fails to mandate a specific

15   course of action.  Instead, it calls for discretionary judgments as to the immediacy and

16   nature of the risk – i.e. what, if any, "immediate" steps are "necessary" to "protect public

17   health and safety, and the environment" –  and if so, judgments as to the substance and

18   timing of those specific steps.

19   Shea also points to the Regional Water Board's Order 96-113 which mandates that the

20   "treatment, discharge or storage of waste or materials shall not be allowed to create a

21   condition of  . . . nuisance."   Again, however, this language does not prescribe a specific

22   course of action that must be followed.  Rather, it is more in the nature of setting an

23   objective or general standard that must be met without prescribing the particular actions

24

25

26   _____

27       [2] Similarly, 40 C.F.R. § 257.3-8(a)(1)(2) just sets a numeric standard.
     Specifically, it provides that : "The concentration of explosive gases generated by the
     facility or practice shall not exceed: (1) Twenty-Five percent (25%) of the lower
28   explosive limit for the gases in facility structures . . . ; and (2) The lower explosive limit
     for the gases at the property boundary."

United States District Court

For the Northern District of California

1   government employee(s) must take to satisfy the standard, or in this case, avoid creating a

2   nuisance. *See also Aragon*, 146 F.3d at 825.

3       Nor does Shea's reliance on *Starret v. United States,* 847 F.2d 539 (9th Cir. 1988),

4   and *Clark v. United States,* 660 F.Supp. 1164 (W.D. Wash. 1987), *aff'd*, 856 F.2d 1433

5   (9th Cir. 1988), advance its cause.  In *Starret,* the Executive Order at issue required a

6   specific course of action: the implementation of a  "secondary treatment, or its equivalent,

7   for all wastes except cooling water and fish hatchery effluents." *Id*. at 541.  While there was

8   a dispute as to whether the government had, in fact, undertaken a "secondary treatment," the

9   directive calling for the secondary treatment was both mandatory and specific.  In contrast,

10  here, the far more general directive to take all immediate steps necessary to protect health

11  and the environment – or to prevent a nuisance – does not involve an equally delineated

12  course of conduct.  Nor does *Clark* assist Plaintiff..  As courts have observed, *Clark* was

13  decided prior to *Berkovitz*, and its analysis "strays significantly from presently accepted

14  discretionary function analysis." *Aragon*, 146 F.3d at 823, n.4; *see also OSI, Inc. v. United

15  States*, 285 F.3d 947, 952 (11th Cir. 2002) (same).

16      In short, the governing regulations in this case do not prescribe a specific course of

17  action but rather demand the exercise of judgment and discretion.  As such, the Court turns

18  to the second tier of the analysis to determine whether the discretionary actions taken are of

19  the type that are susceptible to policy considerations.  *Miller*, 163 F.3d at 594 ("The

20  decision need not be actually grounded in policy considerations, but must be, by its nature,

21  susceptible to a policy analysis").

22

23              2. *Whether actions taken are susceptible to policy considerations*

24       Here, the Corps has been required to exercise its discretion with respect to how to

25  evaluate threats to public health and the environment and how to best address those threats.

26  These kinds of judgments implicate policy choices and decisions of the type that Congress

27  intended to protect from judicial second guessing. *See e.g. Daigle v. Shell Oil Co.*, 972

28  F.2d 1527, 1541 (10th Cir. 1992) (translation of health and safety provisions that require

7

United States District Court

For the Northern District of California

1    measures "necessary to prevent, minimize or mitigate damage to the public health" into

2    concrete plans involves policy choices protected by the discretionary function exception);

3    *Lockett v. United States*, 938 F.2d 630, 638-39 (6th Cir. 1991) (EPA's discretion to

4    determine response to evidence of PCB spill involved judgment calls protected by

5    discretionary function exception); *United States Fidelity & Guaranty Co. v. United States*,

6    837 F.2d 116, 122-23 (6th Cir. 1988) (execution of CERCLA program to protect public

7    from dangers of abandoned toxic waste involves protected policy judgments).

8        Plaintiff cites to cases that involve matters relating to minor or routine maintenance.

9    *See Indian Towing Co. v. United States*, 350 U.S. 61 (1955) (involving failure to maintain

10   a light in a lighthouse); *Gotha v. United States*, 115 F.3d 176 (3rd Cir. 1997) (involving

11   failure to provide a handrail and light on one 20 foot footpath to a trailer).  Such cases do

12   not implicate the same kinds of policy judgments that arise when evaluating and responding

13   to public health and environmental hazards.

14       While neither party cites to a case exactly on point, the Court concludes that this case is

15   more akin to cases such as *Daigle*, *Lockett*, and *Fidelity*, that involve environmental clean up

16   directives than to cases involving minor housekeeping maintenance.[3]   The Court's

17   conclusion is also consistent with the presumption that "[w]hen established governmental

18   policy, as expressed or implied by statute, regulation, or agency guidelines, allows a

19   Government agent to exercise discretion . . . the agent's acts are grounded in policy when

20   exercising that discretion." *Gaubert*, 499 U.S. at 324; *Western Greenhouses v. United*

21   *States*, 878 F.Supp. 917, 928 (N.D. Tex. 1995).

22

23

_____

24       [3] Cases involving very narrow technical issues, as opposed to mandates to
     protect the public health and safety of the environment, are similarly distinguishable.
25   *See e.g. Arizona Maintenance Co. v. United States*, 864 F.2d 1497, 1504 (9th Cir.
     1989) (involving single, objective question of proper amount of dynamite to use for
26   particular task); *Ayala v. United States*, 980 F.2d 1342 (10th Cir. 1992) (involving
     narrow objective of issue of how to configure wiring of add-on lights for particular
27   project).  Notably, Plaintiff is not challenging some technical aspect of the remedy
     selected – e..g., the design of the vent trench; rather, it is challenging the more policy
28   oriented issue of how quickly certain remedies needed to be implemented to protect
     public safety.

United States District Court

For the Northern District of California

1    Plaintiff also emphasizes that the Court should give great weight to the fact that the

2    government in this case is not acting in a core government capacity or making decisions

3    unique to the agency's core mission, but rather is performing ordinary activities that

4    commercial landfill owners perform every day.  In such cases, Plaintiff argues, the

5    government can not satisfy the second prong of the discretionary function test.  For support,

6    Plaintiff cites to *Redland Soccer Club, Inc. v. Dep't. of the Army*, 835 F.Supp. 803 (M.D.

7    Pa. 1993).  Subsequent decisions have concluded, however, and this Court agrees, that

8    *Redland's* limited view of the discretionary function exception is at odds with *Gaubert's*

9    holding that the discretionary function exception protects all governmental discretionary

10   decisions that are susceptible to policy analysis and not just decisions made by high level

11   policy makers or decisions that go to the core of the agency's mission. *See e.g. Aragon v.*

12   *United* States, 950 F.Supp. 321, 326-27 (D.N. Mex. 1996); *Western Greenhouses*, 878

13   F.Supp. at 928-29 (*Redland* is inconsistent with *Gaubert* and the assumptions underlying

14   the discretionary function doctrine); *see also Childers v. United States*, 40 F.3d 973, 974

15   n.1 (9th Cir. 1995) (discretionary function exception applies not just to high-level

16   government employees but also to "low-level employees making discretionary day-to-day

17   management decisions based on policy considerations.").[4]

18       In sum, the Court concludes that the government has satisfied its burden of

19   demonstrating that Plaintiff's fifth through tenth causes of action, alleging state law tort

20   claims, fall within the discretionary function exception to the Federal Tort Claims Act.  As

21

22

23   _____

24        [4] Plaintiff also contends that the Corps can not invoke the discretionary function
     exception based on budgetary considerations because the regulation at issue here does
     not expressly permit the government to balance cost against other considerations.  As
25   the court stated in *National Union Fire Insur. v. United States*, 115 F.3d 1415, 1422
     (9th Cir. 1997), when a statute requires a particular action, the government has no
26   discretion to spend its money doing something else instead.  This is not a case,
     however, where the government failed to take a mandated action because of cost.
27   Rather, in this case the Corps was required to decide what immediate steps were
     necessary to protect public safety and the environment, and it concluded, based on its
28   assessment of the immediacy of the risks, or lack thereof, that a certain schedule was
     appropriate. *See* Hedgpeth Decl., Ex. HH at 3930-3933; Def.'s Ex. 19 at ¶¶ 6-21.

United States District Court

For the Northern District of California

1    such, the Court lacks jurisdiction over such claims and they must be dismissed. *Berkovitz,*

2    486 U.S. at 535-36.[5]

3

4    II.   <u>CERCLA SECTION 113(h)</u>

5         As discussed earlier, Defendant also argues that section 113(h) of CERCLA deprives

6    this Court of subject matter jurisdiction over Plaintiff's fifth through tenth state law tort

7    claims, as well as Plaintiff's fourth claim for relief under RCRA.  The Court's ruling above

8    renders this aspect of Defendant's motion moot with respect to the state law tort claims.

9    The Court considers this argument, however, with respect to Plaintiff's RCRA claim.

10         In 1986, Congress amended CERCLA to add section 113(h) which bars federal

11    courts from exercising jurisdiction over "any challenges" to removal or remedial

12    environmental response actions taken pursuant to section 9604 of CERCLA, 46 U.S.C.

13    §104, while those response action are ongoing – except for five exceptions not applicable

14    here. *McClellan Ecological Seepage Situation ("MESS") v. Perry*, 47 F.3d 325, 330 (9th

15    Cir. 1995).  Specifically, § 113(h) provides as follow:

16       (h) Timing of Review.

17       No federal court shall have jurisdiction under Federal law other than under
         section 1332 of Title 28 (relating to diversity of citizenship jurisdiction) or
18       under State law which is applicable or relevant and appropriate under section
         9621 of this title (relating to cleanup standards) *to review any challenges to*
19       *removal or remedial action selected under section 9604 of this title*, or to
         review any order issued under section 9606(a) of this title, in any action
20       except one of the following . . .

21    46 U.S.C. § 9613(h) (emphasis added).  In short, § 113 (h) amounts to a "clear and

22    unequivocal. . .'blunt withdrawal of federal jurisdiction'" with  respect to any challenges to

23    clean ups conducted under the authority of section 104 of CERCLA, 42 U.S.C. § 9604.

24    *MESS*, 47 F.3d at 328.

25         As a threshold issue, the parties dispute whether the clean up in this action is

26    proceeding under the authority of section 104.  While the government contends that it is,

27

28        [5] Given this conclusion, the Court does not reach Defendant's alternative
argument that Shea's tort claims fall within the misrepresentation exception to the
FTCA.

**United States District Court**
For the Northern District of California

1   Plaintiff argues that the clean up is being undertaken pursuant to the authority of section 120

2   of CERCLA, 46 U.S.C. § 9620, and thus is properly categorized as a § 120 clean up.

3   Section 120 contains provisions applicable to clean ups on federal facilities, such as the

4   former Hamilton Air Force base.

5          The issue is significant because the Ninth Circuit held, in *Fort Ord Toxics Project,*

6   *Inc. v. California E.P.A.*, 189 F.3d 828 (9th Cir. 1999), that when a clean up is conducted

7   pursuant to the authority of § 120, the jurisdictional bar in section 113(h) only applies to

8   removal, and not remedial actions  – and it is Plaintiff's position that the response actions at

9   issue in this case are remedial actions.  Plaintiff concludes, therefore, that under *Fort Ord,*

10  the jurisdictional bar set forth in section 113(h) is inapplicable to this case.

11         This Court concludes, however, that this case does not fall within the facts or

12  rationale of *Fort Ord*.  In *Fort Ord*, the Court found that "§ 120 created a grant of authority

13  separate from § 104." 189 F.3d at 833.   In so finding, the Court relied on those provisions

14  of § 120 that vest authority in the Administrator of EPA to undertake remedial actions.

15  Thus, the Court cites to § 9620(e)(2), which grants *the Administrator of the EPA* the

16  "authority to conduct remedial actions on federal property," and § 9620(g) which provides

17  that "'[No] authority vested in *the Administrator* under this section may be transferred, by

18  executive order of the President or otherwise, to any other officer . . . or person." 189 F.3d

19  at 833-34 (emphasis added). The Court also notes that other provisions of CERCLA that

20  address *remedial* actions distinguish between § 104 and § 120.  *See e.g.* 42 U.S.C. §

21  9613(g) (". . . if the President is diligently proceeding with a remedial investigation. . . under

22  section 104(b) or section 120"); *id.* at 833.  Other provisions in § 120  also address *the*

23  *Administrator's* authority with respect to remedial clean ups at federal cites.  *See e.g.* 42

24  U.S.C. § 9620 (e) - (f).

25         In light of § 120's separate grant of authority to EPA to conduct remedial actions on

26  federal facilities, *Fort Ord* concludes that claims challenging such actions are not barred by

27  section 113(h) – which applies only to clean ups authorized by § 104 .  It further notes,

28  however, that section 120 does not also grant the Administrator authority to conduct

1    *removal* actions. *Id*. at 834.  Thus *Fort Ord* also holds that removal actions on federal

2    property still fall under the general ambit of § 104, and thus are protected by the

3    jurisdictional bar of section 113(h). *Id*.

4          Importantly, it was undisputed in *Fort Ord* that the clean up at issue was a remedial

5    action being conducted by EPA pursuant to the grant of authority created by § 120.  *Fort*

6    *Ord*, 189 F.3d at 834. The site at Fort Ord was placed by the EPA on its National Priorities

7    List and the clean up was being conducted pursuant to EPA's delegated authority through an

8    interagency agency agreement between the EPA, the Army, and California state agencies.

9    *Fort Ord*, 189 F.3d at 830.  Indeed, the EPA administrator has been delegated much of the

10   authority for administering CERCLA. *See* U.S.C. § 9615; Exec. Order 12580, 52 Fed. Reg.

11   2923, 2924 (Jan. 23, 1987).

12          In this case,  however, the site at issue is not included on the National Priorities List

13   and the EPA is not involved.  As a result, authority to undertake the clean up has been

14   delegated to the Secretary of Defense. *See* Section 104 of CERCLA,  42 U.S.C. § 9604

15   (authorizing the President to act in response to releases of hazardous wastes);  Exec. Order

16   12580 at § 2(e) (delegating authority under § 104 to the Department of Defense with

17   respect to contamination on Defense Department facilities; *see also* Def.'s Ex. 21 at 2.

18          Thus the rationale underlying the holding in *Fort Ord* – the creation of a separate

19   authority in § 120 for the Administrator to conduct remedial actions at federal facilities –

20   is simply not applicable here.  *Fort Ord,* of course, did not have occasion to address the

21   relationship between § 120 and § 113(h) in cases, such as this, where the clean up is not

22   being conducted pursuant to the Administrator's authority.  Given however, that *Fort Ord*

23   carved out an exception to the general jurisdictional bar in § 113(h), the Court is not

24   persuaded that is appropriate to extend *Fort Ord* beyond the clear rationale and facts of that

25   case.  As such, it rejects Plaintiff's contention that this case is governed by *Fort Ord,* and

26

27

28

United States District Court

For the Northern District of California

12

1  concludes that the response actions in this case were authorized by § 104 and thus are

2  governed by § 113(h).[6]

3       Given the above, the Court now turns to the effect of § 113(h) on Plaintiff's fourth

4  claim for injunctive relief under RCRA.  As noted above, §113(h) serves as a jurisdictional

5  bar to "any challenges" to an ongoing CERCLA clean up.  Defendant asserts that Plaintiff's

6  fourth claim for relief under RCRA constitutes such a challenge while Plaintiff asserts that

7  it does not.  In particular, Plaintiff argues that it is not seeking to delay or obstruct the

8  chosen remedy; rather, it simply seeks to enforce governing state laws, regulations, and

9  orders.

10      In *McClellan*, however, the Ninth Circuit took a broad view of the scope of

11  § 113(h).  There, the plaintiffs made an argument similar to that advanced here: that their

12  RCRA claim was not a "challenge" under § 113(h) because it was not attempting to delay or

13  obstruct the remedy, but rather was only seeking to compel the defendant's compliance with

14  RCRA's requirements.  47 F.3d at 330-31.  The Court held that while tangentially related

15  claims, such as those to enforce minimum wage requirements, would not constitute a

16  challenge under §113(h), that the plaintiffs' claim was "far more directly related to the goals

17  of the cleanup itself." *Id*. at 330.  The Court also concluded that for "all practical purposes"

18  the plaintiffs were effectively seeking to "improve" the clean up. *Id.*  As such, it found that

19  the plaintiff's claim was a "challenge" barred by § 113(h). *Id*.

20       Here, Shea also argues that it is merely seeking to enforce Defendant's compliance

21  with applicable state laws and requirements.  *See* Pl.'s Opp. at 30.  It is apparent, however,

22  that it has a different view of what state law requires than does Defendant; otherwise it would

23  _____

24      [6]  This is not to say that § 120 has no bearing on federal facilities that are not
listed on the NPL.  For example, § 120(a)(4) provides that a federal agency conducting
25  removal or remedial actions at a facility not listed on the NPL must comply with
applicable State laws.   Such a provision, however, does not create a separate source of
26  clean up authority.
       Plaintiff also argues that Defendant's post-1999 work was conducted pursuant to
27  orders issued by the RWQCB, rather than § 104 of CERCLA, and therefore Plaintiff is
not subject to the restrictions in § 113(h).  While the Corps incorporated state
28  requirements into its response action, Plaintiff's attempt to entirely erase the
underlying § 104 authority from this action is not persuasive.

**United States District Court**

For the Northern District of California

1  have no purpose in seeking injunctive relief.  Indeed, Plaintiff alleges that the Corps'

2  response has not adequately contained or controlled the migration of landfill gas and that it

3  should be "enjoined to abate the migration."  *See* Compl. ¶¶ 72-75.  Plaintiff also contends,

4  as noted above, that the Corps has made improper choices with respect to the timing of

5  certain elements of the remedy.  As such, the Court concludes that Plaintiff effectively

6  seeks injunctive relief to "improve" the on-going clean up.  As such, Plaintiff's RCRA claim

7  is plainly related to the goals of the clean up – and would likely require some interference

8  with on-going clean up plans.  Accordingly, the RCRA claim constitutes a "challenge" for

9  purposes of § 113 (h), and must therefore be dismissed for lack of jurisdiction. *See also*

10  *Hanford Downwinders Coalition, Inc. v. Dowdle*, 71 F.3d 1469, 1482 (9th Cir. 1995)

11  ("We held in *Razore v. Tulalip Tribes*, 66 F.3d 236 (9th Cir. 1995) that '[a]n action

12  constitutes a  challenge if it is related to the goals of the cleanup'").[7]

13          Plaintiff nonetheless urges the Court to allow its RCRA claim to proceed, citing

14  *United States v. Colorado*, 990 F.2d 1565 (10th Cir. 1993), for the proposition that an

15  action to enforce state law is not a challenge under § 113(h).  To the extent that *Colorado* is

16  inconsistent with Ninth Circuit precedent, it is not persuasive.  More fundamentally,

17  however, *Colorado* is clearly distinguishable in that the Court premised its ruling on the fact

18  that the party asserting the RCRA claim was a state, rather than a private party.  *Id*. at 1576

19  ("In light of § § 9652(d) and 9614(a) [of CERCLA], which expressly preserve *a state's*

20  *authority to take such action*, we cannot say that Colorado's efforts to enforce its EPA-

21  delegated authority is a challenge to the Army's undergoing CERCLA response action")

22

23  _____

24          [7] Courts in other circuits have also emphasized the broad sweep of § 113(h). *See*
   *e.g. North Penn Water Authority v. Bae Systems, Inc.*, 2005 WL 1715718, *9 (E.D.

25  Pa.) ("Although in enacting § 113(h) Congress may have been primarily concerned with
   preventing . . . delay[] or obstruct[ion]. . . federal courts have held that, other than the

26  five enumerated exceptions, § 113(h) 'effectuates a 'blunt withdrawal of federal
   jurisdiction,' despite its more limited rationale.'" (citations omitted); *Oil, Chemical &*

27  *Atomic Workers Int'l Union v. Pena*, 62 F. Supp.2d 1, 12 (D.C.D.C. 1999)("Section
   113(h) is very clear, however, that courts are not to interfere with ongoing cleanup

28  actions").

1  (emphasis added).  Accordingly, this Court is not inclined to find that *Colorado* justifies

2  permitting Shea's RCRA claim in this case.

3

4  <u>CONCLUSION</u>

5          For all of the reasons set forth above, this Court concludes that:

6          1.  Defendant's Motion to Dismiss Plaintiff's Fourth through Tenth Claims for lack

7  of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) is granted.

8          2.  Plaintiff's Fourth Claim is dismissed for lack of subject matter jurisdiction

9  pursuant to § 113(h) of CERCLA.

10         3.  Plaintiff's Fifth through Tenth Claims are dismissed for lack of subject matter

11  jurisdiction on the ground that United States has not waived its sovereign immunity with

12  respect to these claims under FTCA.

13

14         **IT IS SO ORDERED.**

15

16  Dated:  November 9, 2005

17                                                    THELTON E. HENDERSON
                                                      UNITED STATES DISTRICT JUDGE

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California